IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| IRON WORKERS TRI-STATE WELFARE PLAN, and its TRUSTEES | ) ) | |
| | ) | 06 C 0580 |
| | ) | |
| Plaintiffs, | ) | Magistrate Judge Jeffrey Cole |
| | ) | |
| vs. | ) | |
| | ) | |
| CARTER CONSTRUCTION, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER
## RE: CARTER CONSTRUCTION, INC.'S MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

The plaintiff has sued Carter Construction under Section 301 of the Taft-Hartley Act (also known as the Labor Management Relations Act ("LMRA")) and Section 502 of the Employee Retirement Income Security Act ("ERISA"). *See generally Sullivan v. William A. Randolph, Inc.,* 504 F.3d 665 (7th Cir. 2007)(Posner, J.). The complaint charged that Carter Construction breached a collective bargaining agreement ("CBA") that required it, among many things, to allow the plaintiff to audit its books and records and make contributions to the union. Taking the "tidbits" theory of pleading, *Kolupa v. Roselle Park Dist.,* 438 F.3d 713, 714 (7th Cir.2006), to its outermost limits, the complaint did not attach the CBA as an exhibit and did not even identify the date of the agreement on which the suit was based.[1]

As a consequence, a core dispute has arisen as to which CBA is involved -- the May 1, 1998

---

[1] This omission has been stressed by the plaintiff. (*Plaintiff's Response to Defendant's Statement of Facts,* ¶ 7).

CBA or separate CBAs executed in 2001 and 2004. For the plaintiff, the operative CBA is the May 1, 1998 agreement between Central Illinois Builders Association ("CIBA") – which was a multiemployer bargaining unit – and Local Union No. 360, International Association of Bridge, Structural, Ornamental and Reinforcing Iron Workers, AFL-CIO. Under the plaintiff's theory, that agreement has yet to lapse, and it is that Agreement which is the wellspring of the obligations that Carter Construction Company has allegedly breached. For Carter Construction, the operative CBA is the three-year agreement CIBA negotiated and executed on its behalf with the Union in 2001 and which terminated in 2004.

## I.
## FACTUAL BACKGROUND

### A.
### The May 1, 1998 Individually Negotiated Collective Bargaining Agreement

On May 1, 1998, CIBA and Local Union 380 executed a CBA on behalf of those members that had delegated their authority to CIBA to collectively bargain with the Union on their behalf. (Affidavit of Brian Diskin, Local 380 Business Manager, ¶ 7; *Plaintiffs' Memorandum of Law in Opposition*, Ex. A, at 29 ("Ex. A" or "the 1998 Agreement")). On October 9, 1998, Carter Construction Company entered into a **"PARTICIPATING AGREEMENT,"** that provided that Carter Construction agreed to adopt, abide by, and be bound by all of the provisions of the CBA "heretofore [on May 1, 1998] entered into between Local Union No. 380. . . and [CIBA]," including any modification, extensions, or renewals of the Agreement. (Ex. A at 30-32)(Capitalization and bold face in original). The May 1 Agreement provided that it was effective as of May 1, 1998 and that it would continue in force through April 30, 2001 and would renew thereafter from year to year, except upon written notice by either party at least 60 but no more than 90 days prior to May 1, 2001

2

of an intent to modify or terminate the Agreement. (Affidavit of CIBA's Director of Labor Relations, Scott Larkin ¶ 8; Ex. A, ¶ 42).[2]

In the instant case, the distinction between an independently negotiated agreement – like the 1998 Agreement between the Union and Carter Construction and a multiemployer bargaining unit-negotiated agreement is significant. (*Plaintiffs' Memorandum of Law in Opposition*, at 2-3, 5; *Plaintiff's Response to Defendant's Statement of Facts*, ¶ 7). While the Union now insists that it is the 1998 Agreement that requires the payments that Carter Construction resists, the complaint is not consistent with that theory: Paragraph 3 of the complaint alleged:

> *The Defendant assigned its bargaining rights to the Central Illinois Builders Association* and is an employer engaged in an industry affecting commerce which entered into an Agreement whereby it agreed to be bound by the provisions of a Collective Bargaining Agreement with Iron Workers Local Union No. 380, and to any subsequent Collective Bargaining Agreements.

(*Complaint*, ¶3)(Emphasis supplied).

The allegation of assignment has no meaning if the complaint was based upon the May 1, 1998 Agreement since Carter Construction made no such assignment in 1998 but rather contracted

---

[2] Like many employers, Carter Construction has from time to time negotiated and executed collective bargaining through the efforts of a multiemployer representative with authority to contract with the Union. In the instant case, that representative is CIBA. (*Carter Construction's Memorandum in Support of Motion for Summary Judgment*, Larkin Aff. ¶ 7); Affidavit of Kenneth Carter, CEO, Carter Construction ("Carter Aff.") ¶ 9; Larkin Aff. ¶¶ 3, 5). Although a member of CIBA since 1985 (Larkin Aff. ¶ 7, Carter Aff. ¶ 9; *Plaintiff's Response to Defendant's Statement of Facts*, ¶ 5), the October 9th Participating Agreement was entered into directly with the Union.

For a member of a multiemployer bargaining unit to be bound by a CBA negotiated by the unit with a union, the employer-member must have expressed an unequivocal intention to be bound by the group action in collective bargaining. *See Moriarty v. Glueckert Funeral Home Ltd.*, 155 F.3d 859, 865 (7th Cir. 1998); *Moriarty v. Pepper*, 256 F.3d 554, 557-8 (7th Cir. 2001)(*cited approvingly in Sullivan*, 504 F.3d at 668). Indeed, the May 1,1998 Agreement expressly noted that it was being signed by CIBA only "on behalf of those firms who have assigned their bargaining rights to the Association." The Union concedes that its October 9, 1998 Agreement with Carter Construction was independently negotiated by Carter Construction and not through the efforts of CIBA.

3

directly with the Union. And why refer to Carter Construction's agreement to be bound by *subsequent* agreements if the 1998 Agreement had never lapsed, as the Union argues in its opposition to the summary judgment motion? Little wonder that Carter Construction's motion for summary judgment did not even mention the 1998 Agreement and focused exclusively on the 2001 and 2004 Agreements. If the plaintiff wanted to sue on the 1998 Agreement that Carter Construction entered into on its own, its complaint would have been drafted differently.

When the Union filed its complaint, the standard for pleadings was quite liberal, *see Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002), and *Bell Atlantic Corp. v. Twombly,* 550 U.S. ----, 127 S.Ct. 1955 (2007) was a year away. Indeed, the Seventh Circuit had warned: "Any district judge (for that matter, any defendant) tempted to write 'this complaint is deficient because it does not contain ...' should stop and think: What rule of law *requires* a complaint to contain that allegation?" *Doe v. Smith,* 429 F.3d 706, 708 (7th Cir.2005) (Emphasis and parenthesis in original). All that a complaint had to do was "name the plaintiff and the defendant, state the nature of the grievance, and give a few tidbits *(such as the date)* that will let the defendant investigate. . . ." *Kolupa,* 438 F.3d at 714 (Emphasis supplied) (parenthesis in original).

Even though the plaintiff was not obligated to set forth specific facts and legal theories of its case in its complaint, Carter Construction was entitled to notice of which agreement underlay the complaint. Notice of the grounds upon which a claim rests is the *raison d'etre* of a complaint. *See Conner v. Illinois Dept. of Natural Resources,* 413 F.3d 675, 679 (7th Cir. 2005). Here, the complaint not only did not notify Carter Construction that it was suing under the 1998 Agreement, but its reference to the assignment of rights to CIBA conveyed a very different message.

This is not an instance where only one particular CBA could possibly be at issue. *See e.g.,*

4

*Minch v. City of Chicago*, 486 F.3d 294, 300 (7th Cir. 2007); *C.H. Robinson Worldwide, Inc. v. Command Transp., LLC*, 2005 WL 3077998, *5 (N.D.Ill. Nov. 16, 2005)(fair notice of claim where plaintiff identified contracts at issue); *Demes v. ABN Amro Services Co., Inc.*, 2001 WL 563813, *2 (N.D.Ill. May 23, 2001)(contracts were attached as exhibits). Here, there are three contracts involved; one was individually negotiated, the others collectively negotiated.

The complaint did not provide adequate notice of which of the several possible agreements was the source of the obligations alleged to have been breached. *Cf., Airborne Beepers & Video, Inc. v. Southwestern Bell Mobile Systems, LLC*, 2006 WL 951877, *3 (N.D.Ill. Apr. 11, 2006)(where more than one contract was possibly at issue in discrimination case, and plaintiff failed (repeatedly) to specify which contract was the basis of its claim, court dismissed claim with prejudice). Quite the contrary. Its allegations seemingly excluded the CBA that it now contends precludes summary judgment. The plaintiff cannot now amend its complaint through allegations or arguments made in response to a motion for summary judgment. *Griffin v. Potter*, 356 F.3d 824, 830 (7th Cir. 2004); *Grayson v. O'Neill*, 308 F.3d 808, 817 (7th Cir. 2002).

But proper resolution of the motion for summary judgment need not rest on this apparent *volte face*. For even if the complaint were construed as providing adequate notice that the 1998 CBA had been breached, there is still no unresolved, genuine issue of material fact.

### B.

### The 2001 Agreement And Its Relationship To The 1998 Agreement

In January 2001, as the 1998 CBA was coming to an end, Carter Construction executed an assignment of its bargaining rights "for the negotiation and administration of new collective bargaining agreements" to CIBA. (*Plaintiffs' Response to Defendant's Statement of Material Facts*,

5

Affidavit of Raymond Sanguinetti, Ex. A). Attached was a roster of labor unions, including Local Union No. 380, with a line next to each. Carter Construction's president initialed each line. By its terms, the assignment remained in force unless terminated by written notice to CIBA. Later that year, CIBA negotiated a collective bargaining agreement ("the 2001 Agreement") with Local Union No. 380, on behalf of its members who had delegated their bargaining rights to it, one of which was Carter Construction. (Larkin Aff. ¶¶ 8-9; Carter Aff. ¶¶ 9-11). The contract was effective as of May 1, 2001 and remained in force until April 30, 2004.

The 2001 Agreement's terms were similar to those of the 1998 Agreement. Indeed, in may particulars and in their ultimate purpose, the CBAs were identical. Like its predecessor, the 2001 Agreement had a three-year term from May 1, 2001 to May 1, 2004, and written notice of termination had to be provided by the terminating party at least 60, but not more than 90 prior to May 1, 2004. (*Carter Construction's Memorandum in Support of Motion for Summary Judgment*, Ex. E, ¶42 at 16).

There is no evidence whether Carter Construction, between February and May 1, 2001 gave the required written notice to the Union of its intent to terminate the 1998 Agreement. However, the Union was free to waive that requirement. 6 S. Williston, Contracts §§ 887B, 887BB (3d ed. 1962 & Supp.1982). The waiver need not have been express to be effective; it is sufficient if the acts or conduct of one party evidenced an intention to relieve the other party of its duty to strictly comply with the contract terms. *See Sullivan*, 504 F.3d at 668; *Little Beaver Enterprises v. Humphreys Railways, Inc.*, 719 F.2d 75, 79 (4th Cir. 1983). *See also infra* at 9, n. 5.

Thus, the question is whether there is an issue of material fact as to whether Carter Construction was bound by the 2001 Agreement with the Union, for if it was, the Union had waived

6

the requirement of written notice of termination when the 1998 CBA was coming to an end in the Spring of 2001, the 1998 Agreement was supplanted by the 2001 Agreement. Obviously, the two contracts, covering as they did the same subject matter and having the same basic purpose, were not intended to coexist. A contrary conclusion is contradicted by a comparison of the two CBAs and would result in Carter Construction being required to make double contributions to the Welfare Fund – an absurd and thus unacceptable result. "There is a long tradition in contract law of reading contracts sensibly; contracts-certainly business contracts of the kind involved here-are not parlor games but the means of getting the world's work done.... " *Beanstalk Group. Inc. v. AM General Corn*, 283 F.3d 856 (7th Cir. 2002) (Posner, J.). *Accord In re Comdisco*, 434 F.3d 963 (7th Cir. 2006) *United States v. Barnett*, 415 F.3d 690 (7th Cir. 2005). *Cf., Alliance to End Repression v. City of Chicago*, 742 F.2d 1007, 1010-1011 (7th Cir. 1986)(*en banc*)(contractual construction to be measured by the consequences of alternative interpretation).

## C.

## The 2004 Agreement

In January of 2003, Carter Construction executed another assignment of bargaining rights to CIBA. (*Plaintiffs' Response to Defendant's Statement of Material Facts*, Affidavit of Raymond Sanguinetti, Ex. A). There was another roster of labor unions, but this time Mr. Carter left some lines blank, initialed others, and initialed and check-marked still others. Local Union No. 380 was initialed. (*Id.*). On February 5, 2004, CIBA sent a certified letter to Local Union No. 380, providing notice of termination of the 2001 Agreement:

Please be advised that Central Illinois Builders of AGC, as an association and on behalf of each individual member for which is holds bargaining rights, hereby terminates the current Collective Bargaining Agreement with Iron Workers Local

Union 380 for the contract expiring April 30, 2004. See the enclosed list of firms.

(Larkin Aff. ¶ 11; Larkin Aff. Ex. A, February 5, 2004 Letter). The attached list included Carter Construction in the first column of the first page. (*Id.*). *The Welfare Plan admits that the letter and the list were received.* (*Plaintiffs' Response to Defendant's Statement of Material Facts*, ¶¶6-7).

The letter also informed the Union that CIBA was in the process of establishing committees and seeking bargaining rights from companies for the upcoming negotiations of a new, 2004 Agreement. (Larkin Aff. ¶ 11; Larkin Aff. Ex. A, February 5, 2004 Letter). To that end, CIBA contacted its member employers to determine which ones would be assigning their collective bargaining rights with Local Union No. 380 for the 2004 Agreement negotiations. (Larkin Aff. ¶ 13; Carter Aff. ¶ 12). CIBA negotiated the 2004 Agreement on behalf of those members who had delegated their bargaining authority to it. Carter Construction was not hiring iron workers on a regular basis at that time, and chose not to have CIBA represent it in the negotiations. (Larkin Aff. ¶ 14; Carter Aff. ¶ 13).[3]

Carter Construction initially took the position that there was notification to the plaintiff of the withdrawal of bargaining authority for the 2004 Agreement. The evidence, however, did not support the claim. The list of firms that had assigned bargaining authority for 2004 did not have Carter Construction's name on it. (*See* Larking affidavit, Ex. B). The list, however, is undated and

---

[3] While the parties agree that Carter Construction withdrew its bargaining rights with respect to Local 380 and the 2004 Agreement, the plaintiff apparently argues that the withdrawal was ineffective because there is no evidence of the required written notice to CIBA. (Defendant's Response to Plaintiffs' Statement of Material Facts, ¶¶ 8-9). Neither the union nor the Plaintiff were parties to the assignment, (Reply to Plaintiffs' Response to Defendant's Statement of Facts, ¶¶ 12-13), and thus they have no standing to object to a condition precedent that CIBA had the right to waive. *Cf. Murray Bernard Industries v. East & West Ins. Co.*, 185 F.2d 20 (7th Cir. 1951); 13 Williston, Contracts § 39.27 (4th ed. by Richard A. Lord, 2000).

one of the employers listed was not a member of CIBA until 2005, long after the 2004 Agreement was negotiated and did not even exist at the time the 2004 agreement came into being. (Plaintiffs' Response to Defendant's Statement of Material Facts, ¶ 14; Plaintiffs' Statement of Additional Facts, ¶¶ 10-12).

In its reply brief and accompanying materials, Carter Construction backs off from its initial argument and admits that Mr. Larkin (CIBA's Director of labor relations) personally handed Mr. Diskin or Local 380 another list that did not include Carter Construction. (2nd Larkin Aff., ¶¶11-12). The list containing Prairie States Steel – the one Carter Construction relied upon when it moved for summary judgment – was simply an "update" of CIBA's list of represented employers, according to Mr. Larkin. (2nd Larkin Aff., ¶¶8-9). Mr. Larkin's handwritten notes of the meeting he had with Mr. Diskin indicate that he handed him an "assignment list" at the beginning of their meeting. (2nd Larkin Aff., Ex. A). But there is no copy of that list in the record, and the Plaintiff maintains that it never received any such list. (Plaintiffs' Response to Defendant's Statement of Material Facts, ¶ 14; Plaintiffs' Statement of Additional, ¶ 5). Thus, for purposes of the present motion, it is assumed that the Union did not have express notification that Carter Construction had withdrawn its bargaining authority from CIBA.

## II.
## ANALYSIS

### A.
### Summary Judgment

The Federal Rules of Civil Procedure mandate that summary judgment be "rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the

9

moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Material facts are facts that "might affect the outcome of the suit" under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A dispute over material facts is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). When considering a motion for summary judgment, "a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Paz v. Wauconda Healthcare and Rehabilitation Centre, LLC,* 464 F.3d 659, 664 (7th Cir.2006). "Courts are required to view the facts and draw reasonable inferences in the light most favorable to the party opposing the motion." *Scott v. Harris,* --- U.S. ----, 127 S.Ct. 1769, 1774-1775 (2007).

Once a properly supported motion for summary judgment is made, the non-moving party cannot resist the motion and withstand summary judgment by merely resting on its pleadings. It must set forth specific facts to establish that there is a genuine issue for trial. Rule 56(e); *Liberty Lobby,* 477 U.S. at 248-50. Thus, to demonstrate a genuine issue of fact, the non-moving party must do more than raise some metaphysical doubt as to the material facts; the non-moving party must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986); *Juarez v. Ameritech Mobile Communications, Inc.,* 957 F.2d 317, 322 (7th Cir.1992). Conclusory allegations and unsupported, self-serving affidavits will not preclude summary judgment. *Keri v. Board of Trustees of Purdue*

10

*University*, 458 F.3d 620, 627-28 (7th Cir. 2006).

**B.**

## The Parties Had a Section 8(f) Relationship

Carter Construction and Local 380 – and in turn, the Welfare Fund – had what is commonly called a "section 8(f) relationship," which is a reference to §8(f) of the National Labor Relations Act. 29 U.S.C. 158(f). They are unique to the construction industry and were born of the temporary, transitory, and seasonal nature of employment in that industry. *Jim McNeff, Inc. v. Todd*, 461 U.S. 260, 266 (1983). "Congress recognized that construction industry unions often would not be able to establish majority support with respect to many bargaining units. . . . [and] was also cognizant of the construction industry employer's need to 'know his labor costs before making the estimate upon which his bid will be based' and that 'the employer must be able to have available a supply of skilled craftsmen for quick referral.'" *Id.*.

The CBAs formed under these auspices are "pre-hire agreements," executed by a union and an employer before the workers to be covered by the contract have been hired or before the union has attained majority status among the firm's employees. *J.W. Peters, Inc. v. Bridge, Structural and Reinforcing Iron Workers, Local Union 1, AFL-CIO*, 398 F.3d 967, 969 n. 1 (7th Cir.2005)(*en banc*). Section 8(f) creates an exception to the general rule that it is an unfair labor practice for an employer to enter a CBA with a union before the union has attained majority status among the employer's workforce. *NLRB v. Local Union No. 103, International Association of Bridge, Structural & Ornamental Iron Workers*, 434 U.S. 335, 348-49 (1978); *Ralph Rogers & Co. v. N.L.R.B.*, 870 F.2d 379, 383 (7th Cir. 1989).

Unlike the more restrictive Section 9 relationship, where the union has majority support

11

among the employer's workforce, thus obligating the employer to bargain with it, *Auciello Iron Works, Inc. v. NLRB*, 517 U.S. 781, 786 (1996), pre-hire agreements – like those between the plaintiff and Carter Construction – are enforceable during their term, but upon their expiration, the employer may withdraw recognition from the union, thereby avoiding any obligation to bargain for a successor contract. *N.L.R.B. v. Howard Immel, Inc.*, 102 F.3d 948, 952 n.3 (7th Cir. 1996); *Haas Elec., Inc. v. N.L.R.B*, 299 F.3d 23, 27-28 (1st Cir. 2002); *Sheet Metal Workers' Intern. Ass'n Local 19 v. Herre Bros., Inc.*, 201 F.3d 231, 239-40 (3rd Cir. 1999); *James Luterbach Constr. Co.*, 315 N.L.R.B. 976, 978, 1994 WL 715997 (1994). The National Labor Relations Board's decision in *Luterbach Construction* put it simply: "if the employer has only an 8(f) relationship with the union, there is no obligation to bargain for a successor contract. Thus, at the end of each contract, the employer has an opportunity to decide anew whether to bargain for a successor contract." 315 NLRB at 980.

## B.

### There Is No Genuine Issue That CIBA Terminated The 2001 Agreement On Behalf Of Carter Construction And Other Member Employers

There is no real dispute that the 2001 Agreement was terminated: CIBA's February 4, 2004 letter to Local 380 notified Mr. Diskin that CIBA, "as an association and on behalf of each individual member for which it holds bargaining rights, hereby terminates the current Collective Bargaining Agreement with Iron Workers Local Union 380 for the contract expiring April 2004. See the enclosed list of firms." Carter Construction's name was on the attached list titled, "Firms Who Have Assigned Their Bargaining Rights to CIBA For Iron Workers 380 (Champaign) For 2001 Negotiations." Only literary perversity or the most jaundiced partisanship could suggest that the

12

letter was insufficient notification of termination of the 2001 Agreement as it related to Carter Construction and the other employers on the list. The plaintiff does not dispute that the letter and accompanying list were timely received. (*Plaintiffs' Response to Defendants' Statement of Material Facts*, ¶ 8-11).

Rather, it appears to be the plaintiff's contention that Carter Construction was not bound to the 2001 Agreement. And why? The only reason given is that "[t]he Complaint does not mention 2001 as the starting date of the agreement." (*Id.*, ¶ 7). But that is simply a statement of fact, not the kind of evidentiary response required when a party denies its opponent's statement of uncontested facts. *See* Local Rule 56.1(b)(3)(B). Moreover, the allegation in paragraph 3 of the complaint that Carter Construction assigned its collective bargaining rights to CIBA is relevant only to the 2001 Agreement. It has no relevance to the 1998 Agreement which was bargained for independently by Carter Construction. Finally, the argument is inconsistent with the plaintiff's concession that Carter Construction had properly delegated its bargaining authority to CBA for the 2001 Agreement and that it had received timely written notification of the termination of the 2001 Agreement – notification which reflected Carter Construction Company among others.

## C.

### Carter Construction Was Under No Obligation To Bargain In The 2004 Negotiations, Either Individually Or As Represented By CIBA, And Took No Affirmative Act That Indicated It Would

When the 2001 agreement was terminated, this being a section 8(f) relationship, Carter Construction had the option of refusing to bargain for a new contract. *Haas Elec., Inc. v. N.L.R.B.*, 299 F.3d at 27; *Herre Bros.*, 201 F.3d at 239-40; *Luterbach Constr.*, 315 NLRB. at 980. If it chose to bargain, it also could

13

decide whether to bargain in a multiemployer unit. The fact that an employer chose to bargain a past contract on a multiemployer basis does not establish that the employer has agreed to bargain a *successor* contract, much less that the employer has consented to bargain a successor contract on a multiemployer basis. Some affirmative act is necessary to establish that consent.

*Luterbach Constr.*, 315 N.L.R.B. at 980-81. And that affirmative act must be "distinct." *Id.* at 980. In such circumstances, the N.L.R.B. held that a two-part test was applicable.

First, was the employer previously a member in a multiemployer bargaining unit or a participant in multiemployer bargaining, such that the union might rely on the employer being bound by the results of the upcoming negotiations, absent notice to the contrary? 315 NLRB at 980. Here, since Carter Construction was a member of the multiemployer unit for the 2001 CBA, Local Union No. 380 might assume that the same would hold true for the 2004 negotiations. As such, the first part of the test is arguably met.

While this initial inquiry is no different than that which would apply in a section 9(a) situation, the second part of the test – the requirement of an affirmative act – recognizes the difference between a section 9(a) and a section 8(f) relationship. 315 N.L.R.B. at 980. The employer must undertake "a *distinct affirmative act* that would reasonably lead the union to believe that the employer intended to be bound by the upcoming of current negotiations." *Id.* (Emphasis supplied). This requirement protects two rights of the employer: the right to bargain for itself if it chooses and, in the context of an 8(f) relationship, the right to refuse to bargain for a successor contract. *Id.* The issue here, then, is whether Carter Construction took any "distinct affirmative act" that would satisfy this test.

In *Luterbach Constr.*, the construction firm had been a member of first one, then another, multiemployer negotiating unit. The move from the first to the second unit was signaled by a written

14

notice not only to the unit, but to the petitioner union of operating engineers. As it happened, the president of the construction firm also represented the second multiemployer unit in negotiations. When time came to negotiate a new CBA, the second multiemployer unit sent notices to its members, including the respondent construction firm, asking them to indicate "yes" or "no" on a form as to whether they were assigning their bargaining rights with respect to various unions, including the operating engineers. The respondent firm authorized the multiemployer unit to represent it in negotiations with several unions, but left the form blank with respect to the operating engineers. Although the respondent firm had not given its definite "no" as required, the multiemployer unit concluded it was not authorized to bargain with the operating engineers on the respondent firm's behalf. 315 N.L.R.B. at 976-77.

At the first bargaining session – which the respondent firm's president chaired – the committee gave the operating engineers' union a list of the firms for which it was bargaining. The list mistakenly included the respondent firm. The firm's president did not learn of the error for two or three sessions, at which time he wrote to the operating engineers' union to inform them of the mistake. He indicated he was withdrawing from the committee, and that his firm would negotiate individually with the union if and when the law required. When the committee and the union later executed an agreement after the next session, the union sought to hold the respondent firm to it. 315 N.L.R.B. at 976-77.

The Board found that the respondent firm was obligated to abide by the new CBA. The firm met the first part of the test, as it was historically a member of the multiemployer unit and had been bound to CBAs through the unit before. However, the Board noted that the firm's president participated in the first three of the four negotiating sessions, thereby conveying a commitment to

15

the union to continue, as in the past, to negotiate as part of the multiemployer unit. *Id.* at 981.

Here, Carter Construction took no such affirmative action and consequently cannot be found to have consented to negotiate the 2004 Agreement on a multiemployer basis. The plaintiff offers three arguments otherwise. First, it contends that *Luterbach Constr.* is inapplicable because in *Laterbach* there had been notification to the union in writing – albeit in an untimely fashion – that the employer was no longer a member of a multiemployer unit for the purpose of negotiating a new CBA. Here there was none. Second, the plaintiff contends that Carter Construction never terminated its assignment of rights to CIBA in 2001 because it did not do so in writing. Finally, Carter Construction took affirmative steps that bind it to the 2004 Agreement. (*Plaintiffs' Memorandum of Law*, at 6-10).

First, the notice arguments. Essentially, the plaintiff argues that in order for Carter Construction to have withdrawn its delegation of bargaining authority from the CIBA for the 2004 negotiations, there had to have been adequate notice to both CIBA and Local Union No. 308. The argument is mistaken: CIBA waived that requirement, and unlike the situation that obtains in a section 9(a) relationship, notice to the Union is unnecessary in a section 8(f) relationship.

The rules the plaintiff seeks to apply here stem from *Retail Associates, Inc.*, 120 NLRB 388 (Jan. 1, 1958), where the Board set forth certain guidelines governing the withdrawal from multiemployer units:

> We would accordingly refuse to permit the withdrawal of an employer or a union from a duly established multiemployer bargaining unit, except upon adequate written notice given prior to the date set by the contract for modification, or to the agreed-upon date to begin the multiemployer negotiations. Where actual negotiations based on the existing multiemployer unit have begun, we would not permit, except on mutual consent, an abandonment of the unit upon which each side has committed itself to the other, absent unusual circumstances.

120 N.L.R.B. at 395. In *Luterbach Constr.*, the Board made clear that those section 9(a) requirements were not applicable to a section 8(f) relationship because "the underlying premise for the *Retail Associates'* rule – an obligation to bargain in *some* unit – does not exist in the context of an 8(f) relationship. Since the underlying premise for *Retail Associates* does not exist with respect to 8(f) relationships, we decline to apply the *Retail Associates'* rule to such a relationship." 315 NLRB at 979.

If the *Retail Associates* rules were applicable to both 8(f) and 9(a) relationships, courts would not embark on the exercise of determining which type of relationship the parties have. *See, e.g., N.L.R.B. v. Triple C Maintenance, Inc.*, 219 F.3d 1147, 1152-56 (10th Cir. 2000); *Herre Bros.*, 201 F.3d at 239 (. . . the distinction between 8(f) and 9(a) significantly affects the analysis concerning withdrawal from a multiemployer bargaining unit. . . ."). Courts only apply the kind of rules the Plaintiff wants to apply here – the *Retail Associates* rules – once it is determined that the parties had a 9(a), as opposed to an 8(f) relationship. *See, e.g., Herre Bros.*, 201 F.3d at 244 (". . . a § 9(a) employer may abandon the multiemployer bargaining unit only if it (1) unequivocally withdraws from the association (2) in a timely fashion before negotiations for a new contract begin (3) by communicating the intent to withdraw to all parties.").

Under *Luterbach Constr.*, the absence of timely notice to the union is simply a species of "inaction" upon which a union in an 8(f) relationship is *not* entitled to rely:

> In the 8(f) context, we conclude that in order for an employer to obligate itself to be bound by multiemployer bargaining, *there must be more than inaction, i.e., the absence of a timely withdrawal*. Thus, unlike in [a 9(a) relationship], mere inaction during multiemployer negotiations will not bind an 8(f) employer to a successor contract reached through those multiemployer negotiations.

315 N.L.R.B. at 979 (Emphasis supplied). So, even assuming that the CIBA did not provide Local

17

Union No. 380 with the list both Carter Construction and CIBA claim it did, *Luterbach Constr.* still applies. There was nothing "more than inaction" by Carter Construction, and that is plainly not enough to bind it to the 2004 multiemployer negotiated Agreement.

Moreover, the plaintiff has not developed the argument beyond a few sentences and cites no supporting authority. (*Plaintiffs' Memorandum of Law*, at 6). The argument is thus waived. *Pruitt v. City of Chicago*, 472 F.3d 925 (7th Cir. 2006); *United States ex rel. Feingold v. AdminiStar Federal, Inc.*, 324 F.3d 492, 494 (7th Cir. 2003); *IFC Credit Corp v. Aliano Brothers General Contractors, Inc.*,437 F.3d 606, 610-611 (7th Cir. 2006); *Baxter Intern., Inc. v. Abbott Laboratories*, 297 F.3d 544, 548 (7th Cir. 2002).

Now to the "affirmative act" arguments. The plaintiff says that there are three examples of affirmative acts that satisfy the second part of the *Luterbach Constr.* test. The first is Carter Construction's submission to an audit on May 9, 2005 – after the 2004 CBA was negotiated and executed, thereby making it impossible to "reasonably lead the union to believe that the employer intended to be bound by the *upcoming or current* negotiations." *Luterbach Constr.*, 315 N.L.R.B. at 980. (Emphasis supplied). Even ignoring the timing problem, Carter Construction's submission to an audit in May 2005 is not, without more, evidence that it was bound to the 2004 Agreement.

In *Sullivan, supra*, the plaintiffs, trustees for a multiemployer pension plan, argued that the defendant construction company manifested acceptance of a CBA by a "course of conduct." Actions can speak as loud as words so long as it is reasonable, in the light of the surrounding circumstances, to infer from those actions a tacit understanding of the parties. 504 F.3d at 668. But the only "course of conduct" evidence in *Sullivan* was that in 1997, though no longer employing anyone represented by the union, the defendant continued filing the monthly contribution reports required

18

by the collective bargaining agreements negotiated by the contractors association. In each report, it put "0" in the space for the amount of contributions due. There was no evidence to contradict its contention that the continued filing of the reports was a clerical oversight rather than a manifestation of consent to be bound by successor agreements. There was no contention that the filing of the monthly reports induced reliance on the part of the pension fund that might estop the defendant to deny that it was a party to the 2000 agreement or that the filing of the reports conferred any benefit on the defendant. *Id.* So too here. As Carter Construction explains, even in May of 2005, it was still obligated to submit to audits regarding obligations incurred under the 2001 Agreement, which was not terminated until 2004.

The second act on which the plaintiff relies is Mr. Diskin's claim that he observed Carter Construction performing work under the jurisdiction of the Iron Workers Union in January of 2005. (*Plaintiffs' Memorandum of Law*, at 9-10). Like the submission to the audit, this event occurred after the 2004 CBA was negotiated and executed. Moreover, Mr. Diskin's affidavit is technically deficient and thus does not support the proposition for which it is offered. There is no sufficiently specific information supporting its generalized and conclusory allegations, no description of the work or an explanation of why it fell under the auspices of Local Union No. 380, or an identification of the declarant or an explanation of the basis on which Mr. Diskin concludes that he was a "superintendent from Carter Construction." [4]

"The object of [summary judgment] is not to replace conclusory allegations of a complaint or answer with conclusory allegations of an affidavit." *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871,

---

[4] If he was not, the statements are outside the scope of Rule 801(d)(2), Federal Rules of Evidence.

888 (1990). Yet, that is what the plaintiff has attempted to do with Mr. Diskin's affidavit. Since it provides no information sufficient to raise an issue of fact, the affidavit is not a barrier to granting summary judgment. *Laborers' Pension Fund v. RES Environmental Services, Inc.*, 377 F.3d 735, 739 (7th Cir. 2004).

Finally, Mr. Diskin's statement that some unidentified individual, who may or may not have been employed by Carter and who may or may not have had any information about a contractual relationship, *vel non*, between Carter Construction and the Union, did not tell him that Carter Construction did not have a contract with Local 380, is analytically meaningless. Silence generally is so ambiguous that it is of little probative force. *United States v. Hale*, 422 U.S. 171, 176 (1975). *Cf. Coleman v. Interco, Inc. Division Plans*, 933 F.2d 550, 552 (7th Cir. 1991)(Posner, J.)("Inferences from silence are perilous."). Here it has none or at least not enough to create a genuine issue of fact.

Finally, there is the contention that Carter Construction did not inform the union that it did not assign its bargaining rights to the CIBA until 2005. This argument is simply a restatement of the plaintiff's argument that section 9(a) rules must be applied to a section 8(f) relationship. The idea is that in a Section 8(f) relationship, unlike a Section 9(a) relationship, the employer is under no continuing obligation to bargain at all, whether independently or as part of a multiemployer unit. As a result, a union cannot rely on a firm's mere inaction to signal its continued participation in the negotiations leading up to the next CBA. "The fact that an employer chose to bargain a *past* contract on a multiemployer basis does not establish that the employer has agreed to bargain a *successor* contract, much less that the employer has consented to bargain a successor contract on a multiemployer basis." 315 N.L.R.B. at 980-81.

Because Carter Construction did not engage in some "distinct affirmative" act before or

20

during the negotiations, there was nothing to signal the union that Carter had consented to CIBA's continued representation. That the plaintiff's examples of affirmative acts occurred after the CBA was executed means the plaintiff is really arguing that it was entitled to operate under the assumption that it was business as usual during the 2004 negotiations and Carter Construction was being represented by CIBA. But in a Section 8(f) relationship, that argument fails.

## CONCLUSION

The defendant's motion for summary judgment [# 34] is GRANTED, and its Motion to

Strike the Affidavit of Brian Diskin [51] is DENIED.

**ENTERED:** _____
     UNITED STATES MAGISTRATE JUDGE

**DATE:** 1/18/08